IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLORIA GOLDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 865 |
| v. ) | |
| ) | |
| THE GUARDIAN LIFE INSURANCE ) | Honorable Charles R. Norgle |
| COMPANY OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court are the parties' cross-motions for summary judgment. Plaintiff Gloria Golden ("Golden") is seeking long-term disability benefits under an employee welfare benefit plan that Defendant Guardian Life Insurance Company of America ("Guardian") underwrote and administered. Guardian previously denied Golden's claim for long-term disability benefits after it determined that Golden was able to perform her job duties on a full-time basis. Guardian's decision prompted this lawsuit. To decide the parties' motions, the Court must consider two primary issues. The first is whether the Court is required to review Guardian's decision to deny Golden's claim under the deferential arbitrary and capricious standard or whether a *de novo* standard applies. The second, keeping in mind the correct standard of review, is whether the factual record supports Guardian's decision. For the following reasons, the Court finds that the arbitrary and capricious standard applies and that the record establishes a reasonable basis for Guardian's decision. Guardian's motion is therefore granted, and Golden's motion is denied.

## I. BACKGROUND

### A. FACTS

These facts are undisputed. Golden at all relevant times was employed by IMS Engineered Products ("IMS") as a "production control planner." Incident to Golden's employment with IMS, she received coverage under a group long-term disability and benefit plan (the "Plan") and a group life insurance plan, which Guardian underwrote and administered. As part of the claims process, if a covered employee with IMS became disabled, he or she could submit a claim to Guardian, which would then determine whether the covered employee was entitled to benefits under the Plan.

The record doesn't reflect the exact date on which the Plan became effective. There is no dispute that the Plan was amended on December 1, 2006 by a document titled, "Employer Rider," which the parties attached to the policy. The rider lists a retroactive effective date of February 1, 2003 and contemplates various additions to the group policy, including the premium payment due dates, the rider's terms and renewal options and definitions of the Plan's terms. See Def.'s Rule 56.1 Statement, Employer Rider. As to the Plan's disability provisions, the Plan provided for long-term disability benefits to a covered employee in the event Guardian determined that the employee was disabled and unable to perform the major duties of his or her occupation on a full-time basis. In making that determination, the Plan conferred to Guardian complete "discretionary authority to determine eligibility for benefits and to construe terms of the *plan* with respect to claims." Admin. R. ("AR") at 573. The Plan also allowed Guardian "the right to secure independent professional healthcare advice and to require such other evidence as needed to decide an employee's claim." Id.

According to the administrative record, Golden's position as a production control planner required her to sit for up to eights hours per day, to walk occasionally for up to two and one half hours per day, to bend occasionally for up to two and one half hours per day and to do what the parties call "fine manipulation" for up to five and one half hours per day. AR at 401. Golden's supervisor, Steven Bush, clarified in a letter dated February 15, 2008 that Golden's "job would require her to chase down product on the floor. She could spend at least 2 ½ hours a days [sic] walking on the shop floor. Her standing was only if she stopped waking to talk to a person or to find product. Much of the rest of the day was spent at her desk." AR at 132. Moreover, an individual named Mable Moore, who at one time had been a production control planner, submitted to Golden's counsel a letter dated May 13, 2008 in which she describes the production control planner position as involving trips to the paint shop "at least 4 times" throughout a typical work day, "[a]s well as interacting and distributing paperwork to" various departments. AR at 131.

On May 24, 2007 Golden stopped working because of knee pain secondary to osteoarthritis. She made a claim for benefits under the Plan and, on August 29, 2007 she began receiving short-term disability benefits in the amount of $1,875.00 per month. Guardian made the payments until October 28, 2007. At some point thereafter, Golden applied for long-term disability benefits, but Guardian denied her claim. Guardian ultimately concluded that Golden was capable of performing her job on a full-time basis and thus she did not qualify for long-term disability under the Plan. And as to life insurance benefits, Guardian denied Golden's claim without payment of premium because she was not totally disabled as the Plan required. Golden appealed Guardian's decision, and after a review of her claim Guardian declined to reinstate

Golden's disability payments. There is no dispute that Golden exhausted her administrative remedies before turning to this Court for relief.

Golden's complaints began in May 2007. Pl.'s Rule 56.1 Statement, ¶ 23. According to a letter written by counsel and made part of the administrative record, she was under the care of a family practitioner, Dr. Crystal Peoples, for various ailments and she had experienced "severe knee pain since the Fall 2004." Pl.'s Rule 56.1 Statement, ¶ 24.

On June 12, 2007, upon realizing that the initial treatment for her knee pain wasn't working, Golden visited an orthopedic surgeon, Dr. Michael Hejna. In his referral notes, Dr. Hejna noted that Golden was initially treated with a drug called, "Synvisc," which is used to treat pain associated with osteoarthritis, and that over time she was given five to six cortisone injections. AR at 354. Dr. Hejna also noted that the medication provided Golden no relief and that the cortisone injections provided her "some temporary relief." Id. Dr. Hejna confirmed that Golden suffered from "minor arthritis," thus he recommended a follow-up examination after she received an MRI. Id.

On July 2, 2007 Dr. Hejna performed arthroscopic surgery on Golden, as the MRI revealed "moderate advanced" degenerative changes and tearing to Golden's menisci. Id. As it turned out, during the procedure Dr. Hejna discovered that the degenerative changes to Golden's knee were more advanced than the MRI indicated. Id.

On November 26, 2007 Dr. Peoples completed an "Ongoing Physician's Statement of Disability," in which she reported that Golden's prognosis had not changed, that Golden had not been released to return to work and that Golden's physical limitations qualified as "Class 5," meaning that in Dr. Peoples' estimation Golden's functional capacity was severely limited and

that she was "incapable of minimal (sedentary) activity." AR at 216. Golden continued to visit Dr. Peoples on a monthly basis from November 2007 through May 2008.

On January 14, 2008 Guardian referred Golden to NovaCare Rehabilitation Center for a functional capacity evaluation ("FCE"). The parties agree that the purpose of the FCE was to determine whether Golden could perform the duties of her position as a production control planner. An occupational therapist, Brian Kilbane ("Kilbane"), completed the FCE, in which he noted that "[b]ased upon the information provided (per J.A.) and information per client" the production control planner position required Golden to perform tasks at the sedentary demand level. AR at 197. Golden reported to Kilbane that prolonged standing or walking and bending her knees aggravated her symptoms, though rest and medication usually provided relief. AR at 199. And, during the FCE's treadmill test, Kilbane reported that Golden could not attain the minimal 2.0 mph pace and that because of her knee pain she stopped walking after thirty-seven seconds at a pace of 1.2 mph. AR at 200. In the end, Kilbane concluded that Golden's abilities were "consistent with the essential functions of her job as a Production Planner." AR at 196. In support, he noted that Golden could perform a variety of minor tasks on a constant basis, that she could walk, balance herself and stoop on a frequent basis and that she could stand and climb steps on an occasional basis. Id. He also found that Golden's reports of increased pain during the examination were "not substantiated by significant increases in heart rate, respiration, or changes in movement patterns." Id.

On April 8, 2008 Guardian sent to Golden a detailed letter in which it explained that she no longer met the requirements for disability payments under the Plan. AR at 183. In a section titled, "How we reached our Decision," Guardian stated that considering her job requirements and the FCE it appeared that Golden could meet the essential functions of her position as a

5

production control planner. Id. Guardian also explained that on three occasions it sent a copy of the FCE to Dr. Peoples for comment, but she failed to respond. Id. at 183-84.

In response to Guardian's denial, Golden sought a vocational report from an independent expert, Thomas Grzesik. On June 17, 2008, after reviewing various records and documents, Grzesik sent his findings to Golden's counsel, in which he disagreed with the FCE in many ways. For example, he disagreed that the production planner position was a sedentary position; he disagreed with the evaluator's failure to publish the full definitions of the physical demand categories; he disagreed with how the evaluator defined the terms "occasionally," "frequently" and "continuously;" he disagreed with the accuracy of the evaluator's conclusions because the FCE only lasted 3 hours and 15 minutes, which, according to Grzesik, provides "no more than a snapshot of Ms. Golden's physical capabilities;" and he disagreed with the FCE's lack of specificity. See AR at 104-109. Based on these disagreements, though Grzesik did not conduct an independent examination and was not present at the FCE, he concluded, "[e]ven if one were to accept the FCE findings as reported, Ms. Golden would still be unable to perform the physical aspects of her job of production planner. . . ." Id. at 109.

A few days later, on June 24, 2008 Dr. Peoples completed a questionnaire that indicated that despite Golden's arthroscopic surgery, she experienced little relief from her knee pain. AR at 99. Dr. Peoples noted that Golden's pain was at a "9 out of 10" severity level and that she suffered from sharp and throbbing pain that increased with activity or after prolonged sitting. Id. Guardian claims, however, that Dr. Peoples' answers on the questionnaire merely reiterated Golden's subjective complaints. See Def.'s Resp. to Pl.'s 56.1 Statement ¶ 31.

On August 25, 2008 Golden through her attorney appealed Guardian's decision to deny her disability claim. AR at 91-98. In light of the appeal, Guardian requested additional

6

information from Dr. Peoples and asked Kilbane to issue an additional report of his findings. To assist with the additional report, Guardian sent to Kilbane Golden's appeal letter, Dr. People's questionnaire and Grzesik's vocational report. AR at 90, 116-117. On September 19, 2008 Kilbane provided Guardian with an updated report in which he responded to the assertions made by Grzesik and Golden's counsel. The gist of his response is that neither of these individuals were present during the FCE and thus their views simply reflected Golden's subjective opinions of her abilities. AR at 84. He also took issue with Grzesik's description of Golden's position, asserting that his conclusion that a production control planner is a sedentary position is supported by the employer's description of the position, by the client's own description of her duties and by the Department of Labor's Dictionary of Occupational Titles. Id. At one point Kilbane asserts that Grzesik's vocational report is inconsistent. AR at 85.

Guardian next turned to Dr. Andrea Wagner, an independent peer review physician, to assist in evaluating Golden's claim on appeal. In doing so, the company submitted to Dr. Wagner all medical records, statements, evaluations, reports and documents that pertained to Golden. It also requested that Dr. Wagner speak directly with Dr. Peoples. On October 6, 2008 Dr. Wagner submitted her review. In it she confirmed that Golden's medical record contains evidence of degenerative changes to her knees, "as well as a tear in the posterior horn of the medical meniscus." AR at 786. And, as to Golden's limitations, Dr. Wagner stated that it would be reasonable to preclude some physical activities, such as "kneeling, squatting, climbing of ladders, crawling, or greater than occasional single level stair climbing." AR at 787. Golden could, however, stand and walk occasionally, sit constantly and would have no restrictions with respect to her upper extremities. Id. Lifting and carrying would be limited to twenty-five pounds or less. Id.

When asked to comment on the FCE, Dr. Wagner opined that the FCE provided a reasonable amount of objective data to assess Golden's functionality and that it was "likely" that the FCE's conclusion was reasonable. Id. With respect to Dr. Peoples' assessment, Dr. Wagner noted that the basis of Dr. Peoples' opinion was not clear because no evidence existed to show that Dr. Peoples conducted a functional assessment or detailed physical examination of Golden's abilities, and thus Dr. Peoples' conclusion was based on subjective data. AR at 788-89. As to Grzesik's vocational report, Dr. Wagner explained that Grzesik completed the report "without taking into account a detailed musculoskeletal assessment or imaging data." Id. She noted, "[t]here is insufficient data in the medical record and Dr. Peoples' notes to support [Grzesik's] assessment." Id. In the end, Dr. Wagner stated that an independent medical examination would be useful, as it would provide a musculoskeletal assessment and details of Golden's physical impairments. AR at 790.

Based on Dr. Wagner's recommendation, Guardian referred Golden to an independent medical examiner, Dr. Chrisopher Reger. He issued a report dated November 4, 2008. There Dr. Reger recounted the history of Golden's condition, recorded his observations based on a personal interview and medical exam and documented his review of Golden's medical records. In a section titled, "Current Medical Complaints," Dr. Reger noted that Golden represented that she can stand for thirty minutes before she has to sit down. AR at 674. She can stand again after resting for a brief period. Id. Golden also represented that she can walk for "a half-hour to an hour a day, but needs to use her walker or cane." Id. In the end, Dr. Reger deduced that the exam's objective findings did not completely substantiate Golden's subjective complaints. AR at 679. Dr. Reger also opined that Golden could stand for thirty minutes at a time with rest periods thereafter, that she could walk for thirty minutes with an assistive device and that she had

8

"no limitation to reaching from a sitting position or any overhead reaching problems." AR at 680. Dr. Reger concluded that Golden "is capable of functioning at a sedentary level with possibly some activities within a light-activity level." AR at 680-81.

When comparing his findings to the opinions of the other assessors, Dr. Reger said that his findings were consistent with approximately 80% of Kilbane's FCE because during the FCE Golden was not using an assistive device, and with the assistive device Golden was unable to push or pull any type of weights during his examination. AR at 681. And as to Dr. Peoples' assessment, Dr. Reger did not believe that her findings were accurate because they seem to have been based on Golden's subjective complaints. Dr. Reger concluded that Golden could return to work, within various restrictions, so long as her pain medication is adjusted to alleviate Golden's "biggest concern for failure going back to work[,] . . . her pain complaints." AR at 682-83.

On November 17, 2008 Golden's counsel wrote to Guardian and asserted that Dr. Reger was not familiar with the duties and requirements of a production control planner. See AR at 655. Guardian responded on November 21, 2008, explaining that Guardian received a description of a production control planner's duties from the employer, IMS, and provided this description to Dr. Reger. AR at 655-59. Then, on December 4, 2008 Dr. Reger issued an addendum to his prior report in which he disagreed with Golden's counsel's assertion that he "was not aware of the requirements of a Production Planner." AR at 624. He explained that even after reevaluating what the job entails he would not change his prior recommendations. AR at 625.

The following month, on December 16, 2008 Guardian contacted Golden's supervisor, Steve Bush, to confirm the physical requirements of Golden's position. He stated that the production planner position was a "production clerk type position." AR at 58. He also stated

9

that it was "more clerical than engineering," and that it would require walking for approximately fifteen minutes to up to one-half hour at a time. Id. The position served three departments located in the same general area, the closest approximately fifty yards away and the farthest approximately eighty yards away. Id. And as to the frequency with which a production control planner would have to visit those departments, Golden's supervisor stated that the "position is 'up and down all day.'" Id. When asked to elaborate, he said that a production control planner could visit the three departments every one and one-half hours or perhaps five times per day. Id. He confirmed that the position could be done with a cane, but it would take more time. Id.

## B. Procedural History

On December 22, 2008 Guardian informed Golden's counsel that upon reconsideration its "decision to decline continued long-term disability benefits [was] correct and proper." AR at 626. Golden turned to this Court for relief. She initiated this case on February 11, 2009, claiming that under ERISA she meets the definition of "disabled" and is therefore entitled to long-term disability benefits. Golden filed an amended complaint in February 2009 and both parties moved for summary judgment later the same year. The parties eventually filed the administrative claim record under seal, which the Court shall consider in deciding these motions. The motions are fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether genuine issues of material fact exist, the reviewing court construes all facts and draws all reasonable inferences in favor of the non-moving party. See

FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chi., 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See U.S v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 280 (1968); Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B. *DE NOVO* V. ARBITRARY AND CAPRICIOUS STANDARD

As an initial matter, the Court must determine the appropriate standard through which it will evaluate Guardian's denial of benefits. Again, Golden advocates for *de novo* review, while Guardian asserts that the Court should apply the deferential arbitrary and capricious standard. To settle this dispute, the Court turns to the following authority.

"Under ERISA, judicial review of a plan administrator's benefits determination is *de novo* unless the plan grants discretionary authority to the administrator." Marszalek v. Marszalek & Marszalek Plan, 485 F. Supp. 2d 935, 936-37 (N.D. Ill. 2007) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). Where a qualifying plan gives the administrator discretionary authority to determine eligibility for benefits, the court shall review the administrator's decision to deny benefits under the arbitrary and capricious standard. Hackett v. Xerox Corp., 315 F.3d 771, 773 (7th Cir. 2003). And to determine whether a plan administrator has discretionary authority, the court looks to the plain language of the plan. Postma v. Paul Revere Life Ins. Co., 223 F.3d 533, 538 (7th Cir. 2000).

In this case neither party disputes that the Plan contains a provision that gives Guardian discretionary authority to determine a claimant's eligibility for benefits. Typically, as stated above, this alone would be enough for the Court to end the inquiry and review Guardian's denial

11

of benefits under the arbitrary and capricious standard. Hackett, 315 F.3d at 773; Trombetta v. Cragin Fed. Bank for Savings Employee Stock Ownership Plan, 102 F.3d 1435, 1438 (7th Cir. 1996). But Golden has challenged this conclusion, arguing that the Plan's discretionary clause is invalid because in 2005 the Director of the Illinois Department of Insurance (the "Director") banned discretionary clauses in insurance contracts. ILL. ADMIN. CODE tit. 50 § 2001.3 (2005). This ban, says Golden, effectively bars Guardian from relying on the discretionary clause to invoke the arbitrary and capricious standard.

In response, Guardian raises three arguments that dispute the applicability of the Illinois regulation to this case. Guardian first asserts that the Illinois regulation does not apply because it is not retroactive, and because the Plan was enacted before the regulation took effect. Next, and in the alternative, Guardian claims that even if the regulation applies, ERISA preempts the regulation because it directly affects how Guardian would administer the Plan. Finally, Guardian maintains that if preemption doesn't apply, the Court should consider the regulation ineffective because the Illinois Insurance Code does not authorize the Director to adopt and enforce this type of regulation. The Court shall discuss each of these contentions in turn, though we note that if Guardian is successful on any of these fronts, the Court need not reach the remaining challenges.

Again, Guardian first argues that the Illinois regulation that Golden cites is ineffective because the regulation is not retroactive and because it was promulgated after the Plan was established. Turning to the Plan, the parties do not tell us the precise date that the Plan was established, though the evidence shows that an addendum was attached to the Plan on December 1, 2006. This addendum contained a retroactive effective date of February 1, 2003, which confirms that the Plan went into effect either on or sometime before that date. It follows, then, that since the regulation has an effective date of July 15, 2005 – after the Plan's effective date –

Guardian is right to say that the regulation's ban on discretionary clauses does not apply here. See Marszalek, 485 F. Supp. 2d at 938-39 (holding that the same Illinois regulation "fails to invalidate discretionary clauses in insurance policies issued prior to July 15, 2005.") (citing Dryer v. Metro. Life Ins. Co., 459 F. Supp. 2d 675 (N.D. Ill. 2006)); see also Guerrero v. Hartford Fin. Servs. Group, No. 05 C 2787, 2006 WL 1120526, at *7 n.3 (N.D. Ill. Apr. 26, 2006) (noting that argument with respect to the Illinois regulation fails because the regulation became effective after the parties executed the plan and agreement); Williams v. Group Long Term Disability Ins., No. 05 C 4418, 2006 WL 2252550, at *3 (N.D. Ill. Aug. 2, 2006) (finding that the Illinois regulation did not apply because the plan was executed prior to the regulation's effective date).

Golden claims, however, that the Illinois regulation applies in this case because the Plan's effective date is actually December 1, 2006, the date the parties attached the addendum to the policy. Generally, in Illinois, the renewal of an insurance policy is perceived to be a new contract, particularly where "material and significant differences" in the two policies exist. Am. Auto Guardian, Inc. v. Acuity Mut. Ins. Co., 548 F. Supp. 2d 624, 628 (N.D. Ill. 2008) (quoting Doe v. Ill. St. Med. Inter-Ins. Exch., 599 N.E.2d 983, 989 (Ill. App. Ct. 1992)). Relying on this principle, Golden insists that the parties' addendum created a *new* policy with an effective date of December 1, 2006, after the Illinois regulation took effect. The Court disagrees.

There is nothing to suggest that the parties executed a new contract based on the existence of "material and significant" differences between the parties' original policy and the addendum. First of all, only one policy exists, as the addendum did not completely supplant the terms of the parties' original policy. Also, there is no evidence that the parties, at any point, altered the policy's terms. The amendment in this case is simply a detailed rider, or a

13

supplement to the policy, with a retroactive effective date of February 1, 2003. As it turns out, this case involves the same policy with a retroactive addendum. This presents an entirely different scenario than the one in American Auto., a case that Golden cites extensively in support of her position. 548 F. Supp. 2d at 629 (finding that renewal created new policy where there were three different policies, with different provisions for three distinct policy periods, and where the policy renewal created a one year period of effectiveness, increased premiums and altered the policy's terms). Accordingly, the Court finds that the parties' addendum did not result in a new policy, that the addendum's effective date remains February 1, 2003, that the Illinois regulation does not apply and that the arbitrary and capricious standard governs the Court's determination.

We note that since Guardian prevailed on its initial argument, the Court need not discuss Guardian's remaining arguments as to why the Illinois regulation does not apply in this case. The Court shall employ the arbitrary and capricious standard.

## C. THE PLAN ADMINISTRATOR'S DETERMINATION

Under the arbitrary and capricious standard the Court may overturn an administrator's decision only if the decision is "downright unreasonable." E.g., Mote v. Aetna Life Ins. Co., 502 F.3d 601, 606 (7th Cir. 2007). This standard is deferential, but it is not a "rubber stamp," as the Court will not uphold a denial of benefits if the plan administrator fails to articulate specific reasons for rejecting evidence and denying the claim. Black v. Long Term Disability, 582 F.3d 738, 745 (7th Cir. 2009) (citing Williams v. Aetna Life Ins. Co., 509 F.3d 317, 324 (7th Cir. 2007)). The court's ultimate goal is to ensure that the plan administrator's decision has rational support in the record. See Speciale v. Blue Cross & Blue Shield Ass'n, 538 F.3d 615, 621 (7th Cir. 2008); Exbom v. Central States S.E. & S.W. Areas Health & Welfare Fund, 900 F.2d 1138,

1143 (7th Cir. 1990) (explaining that there must be a rational connection between the facts found and the administrator's decision). In making its determination, a reviewing court must consider: (1) the administrator's impartiality; (2) the complexity of the issues; (3) the process afforded the parties; (4) the extent to which the administrator utilized experts; and (5) the soundness of the administrator's rationale. Williams, 2006 WL 2252550, at *6 (citing Chalmers v. Quaker Oats Co., 61 F.3d 1340, 1344 (7th Cir. 1995)).

As to first element above, which considers the existence of a conflict of interest, it is important to note that this factor does not require heightened scrutiny and does not change the standard of review from deferential to *de novo*. See Metro. Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2350 (2008). In this context, "conflicts are but one factor among many that a reviewing judge must take into account." Id. at 2351 (confirming that judges will take into account several considerations of which a conflict is one). The conflict inquiry should prove more important where the circumstances suggest a high likelihood that the conflict affected the administrator's decision, such as cases in which the administrator has a history of biased claims administration. Id. The conflict should prove less important, however, where the circumstances suggest that the administrator took active steps to reduce the potential for bias and to promote a more accurate decision. Id. With these standards in mind, the Court turns to Guardian's decision.

For this Court to uphold Guardian's decision, it must find that the decision was rationally based on evidence in the administrative record. The sole issue, then, is whether a rational basis existed in the record for Guardian to conclude that Golden could perform the duties of a production control planner, which would justify its decision to deny her disability benefits. The Court finds that it did.

Without repeating the details of the medical examinations and conclusions that the Court outlined above, it is important initially to point out the steps that Guardian took in denying Golden's claim. The first step in reviewing Golden's claim was to have her submit to Kilbane's functional capacity evaluation. At the FCE, Kilbane conducted a detailed physical examination, while Golden assisted him in establishing the physical requirements of her job. Using this assessment, Guardian denied Golden's claim. But this didn't end the inquiry. When Golden appealed Guardian's decision, the company submitted Golden's records to an independent peer review physician, Dr. Wagner, who not only reviewed Golden's medical records, but also consulted with Golden's treating physician, Dr. Peoples. And although Dr. Wagner agreed for the most part with the results of Kilbane's FCE, Guardian took the additional step of referring Golden to a board certified physical medicine and rehabilitation specialist, Dr. Reger, for an independent medical examination. Based on yet another personal examination, Dr. Reger opined that Golden could perform the duties of a production control planner. Then, finally, with the help of any clarification and addendums that Guardian sought from its experts, the company concluded its administrative review and affirmed the denial of Golden's claim for disability benefits.

The procedure that Guardian followed in denying Golden's claim does not evidence a method that was partial or incomplete. The record reflects that Guardian went out of its way to assess Golden's claim to the fullest extent. All of the individuals that Guardian relied upon, including a functional capacity specialist, an independent peer review physician and a board certified independent medical examiner, agreed that keeping in mind certain physical restrictions and the use of a cane Golden could perform the duties of a production control planner. Facing this type of detailed review, it is difficult if not implausible for Golden to establish that there is

no rational connection between the medical evidence and Guardian's determination that Golden was able to perform her job and therefore ineligible to receive disability benefits.

Golden argues, however, that Guardian's decision is conflicted and thus arbitrary because the company overemphasized the conclusions in Kilbane's FCE and ignored the problems that Grzesik, Golden's own vocational consultant, "exposed." Pl.'s Mem. at 9. But this simply isn't the case. The evidence shows that Guardian recognized that the FCE could be challenged, and thus the company took extra steps to clarify and explain any findings with which Golden took issue. The evidence simply does not support the contention that Guardian ignored Grzesik's opinions. Instead it shows that Guardian gave careful consideration to Golden's claim both at its inception and during the appeal. As Guardian points out in its response brief, the company "(1) employed a functional capacity examiner who personally examined and tested the plaintiff, (2) employed an independent peer review physician who not only independently assessed the FCE but also personally spoke with the plaintiff's treating physician, (3) engaged a physician to conduct an in-person independent medical examination, (4) went back to the plaintiff's employer to clarify her job duties and (5) concluded the administrative review by seeking further clarification from the FCE examiner himself." Def.'s Mem. at 13. According to the administrative record, there is nothing to suggest that Guardian disregarded or "ignore[d] the valuable observations made by a treating doctor," as Golden would have us believe Pl.'s Mem. at 12.

The Court finds that Guardian's decision to deny Golden's claim for disability benefits is rationally supported by the record. Upon a close review of the administrative record and the parties' submissions, the evidence does not show that Guardian disregarded evidence or failed to

afford Golden an appropriate opportunity to substantiate her claim. Accordingly, summary judgment is warranted in favor of Guardian.

## III. CONCLUSION

For the reasons stated above, Defendant Guardian Life Insurance of America's motion for summary judgment is granted. Plaintiff Gloria Golden's motion for summary judgment is denied.

IT IS SO ORDERED

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED: 6/1/10